# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| WORLDCOM, INC., ET AL., | : | |
|     Plaintiffs, | : | |
| | : | |
| v. | : | Civil No. 3:00CV1919(CFD) |
| | : | |
| CONNECTICUT DEPARTMENT OF PUBLIC | : | |
| UTILITY CONTROL, ET AL. | : | |
|     Defendants. | : | |

## MEMORANDUM OF DECISION

Plaintiffs WorldCom, Inc., Brooks Fiber Communications of Connecticut, Inc., MCI WorldCom Communications, Inc., and MCIMetro Access Transmission Services, LLC (collectively, "WorldCom") brought this action under the Telecommunications Act of 1996, 47 U.S.C. §§ 251 *et seq*. (the "Act" or "1996 Act") and its implementing regulations against defendants Connecticut Department of Public Utility Control ("DPUC"), Donald W. Downes, Glenn Arthur, Jack R. Goldberg, Linda J. Kelly Arnold, and John W. Betkowski (collectively, the "Commissioners"), and Southern New England Telephone Company ("SNET").[1]  In its complaint, WorldCom sought review of a DPUC order issued pursuant to the Act.[2]  The Court grants WorldCom the declaratory and equitable relief sought in its complaint.

The following constitutes the Court's findings of fact and conclusions of law.

---

[1]Where appropriate, the DPUC and the Commissioners together will be referred to as the "state defendants." Although WorldCom and SNET have since been acquired by MCI, Inc., and SBC, Inc., respectively, the Court will continue to refer to them as named in the complaint.

[2]As part of a ruling denying SNET's Motion to Dismiss, the Court ordered the parties to file proposed rulings on the merits of WorldCom's request for declaratory and injunctive relief. [See Doc. # 60].  The Court has received proposed rulings from WorldCom, the DPUC, and SNET, and the parties have agreed that the Court may issue its memorandum of decision on the basis of the record before it.

I.    Background

    A. The 1996 Act

Until recently, local telephone service was essentially a monopoly.  As the United States

Supreme Court explained: "States typically granted an exclusive franchise in each local service

area to a local exchange carrier ("LEC"), which owned, among other things, the local loops

(wires connecting telephones to switches), the switches (equipment directing calls to their

destinations), and the transport trunks (wires carrying calls between switches) that constitute a

local exchange network."  AT&T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 371 (1999).  The 1996

Act fundamentally altered this regime.  "States may no longer enforce laws that impede

competition, and incumbent LECs are subject to a host of duties intended to facilitate market

entry."  Id.  One of the principal responsibilities of an incumbent LEC under the Act is to allow

its competitors to share its network; this sharing is termed "interconnection." See 47 U.S.C. §

251(c)(2).  An incumbent LEC also has the duty to provide to "any requesting

telecommunications carrier for the provision of telecommunications service, non-discriminatory

access to network elements on an unbundled basis at any technically feasible points on rates,

terms and conditions that are just, reasonable, and nondiscriminatory in accordance with the

terms and conditions of the agreement and the requirements of [47 U.S.C § 252]."[3]  47 U.S.C. §

251(c)(3).

    When an incumbent LEC receives a request for interconnection from a competing

---

[3]A "network element" is "a facility or equipment used in the provision of a
telecommunications service." 47 U.S.C. § 153(29).  It also includes "features, functions, and
capabilities that are provided by means of such facility or equipment, including subscriber
numbers, databases, signaling systems, and information sufficient for billing and collection or
used in the transmission, routing, or other provision of a telecommunications service." Id.

telecommunications carrier, the incumbent LEC may negotiate and enter into a binding

agreement with the competitor.  Id. § 252(a).  The agreement must contain itemized charges for

each service or network element covered by the agreement.  Id.  When negotiating

interconnection agreements with its competitors, the incumbent  LEC has a duty to act in good

faith.  Id. § 251(c)(1).  However, if differences can not be resolved, either the incumbent LEC or

the competitor may ask the state commission that regulates local telephone service to become

involved in the negotiations as a mediator, or may petition the state commission to arbitrate any

remaining open issues.  Id. §§ 252(a)(2), (b)(1).  Each interconnection agreement, whether

adopted by negotiation or arbitration, must be approved by the state commission.  Id. § 252(e)(1).

The state commission has limited grounds on which it may base a rejection of an agreement.   Id.

§ 252(e)(2).  For example, it may reject an arbitrated agreement if it finds that it does not meet

the requirements of § 251, such as the requirement that the incumbent LEC's rates, terms and

conditions for interconnection and unbundled network elements must be "just, reasonable, and

nondiscriminatory."  Id. § 251(c)(2), (3).  After the state commission acts,[4] "any party aggrieved

by such determination may bring an action in an appropriate Federal district court to determine

whether the agreement or statement meets the requirements of section 251 of this title and this

section."  Id. § 252(e)(6).

B.  The parties

Plaintiff WorldCom, Inc. offers telephone service in Connecticut through its wholly

owned indirect subsidiaries and fellow plaintiffs, Brooks Fiber Communications of Connecticut,

---

[4]The Act also contains provisions addressing situations in which the state commission
fails to act.  Id. § 252(e)(4), (5), (6).

Inc., MCI WorldCom Communications, Inc., and MCIMetro Access Transmission Services,

LLC.  Each subsidiary is a telecommunications provider under the 1996 Act.

Defendant SNET is an incumbent LEC under the meaning of § 252(h)(1) of the Act.

Defendant DPUC is a state commission that has "regulatory jurisdiction with respect to intrastate

operations of carriers."  Id. § 153(41).  The remaining defendants are commissioners of the

DPUC, and they are sued only in their official capacities.

C.  The dispute

In 1996, SNET and WorldCom, a requesting telecommunications carrier, engaged in

negotiations regarding a proposed interconnection agreement.  After the parties were unable to

resolve certain issues, WorldCom filed a petition with the DPUC for compulsory arbitration as

provided  under the Act.  On April 23, 1997, the DPUC issued a final order approving an

interconnection agreement between the parties, which was the product of arbitration.  Under its

terms, the prices of certain unbundled network elements ("UNE") were to be incorporated into

the agreement when they were updated, approved and filed in another, ongoing, DPUC

proceeding.

In that other proceeding, the DPUC was attempting to establish a tariff pursuant to which

SNET would offer UNEs to telecommunications carriers such as WorldCom.   On May 20, 1998,

the DPUC issued its final decision in that proceeding.  In that decision, the DPUC noted that it

accepted SNET's costs studies on a preliminary basis, and requested that SNET file additional

cost studies by September 1, 1998.  On the basis of the preliminary cost studies, however, the

DPUC approved an interim rate for recurring and nonrecurring charges based on the total service

long run incremental cost (TSLRIC) methodology, plus 35% "contribution."  That interim rate

was limited to UNEs that had not been offered previously, however, and did not extend to

services that were available already from SNET.  The DPUC concluded that four of the services

contained in SNET's tariff request already were being offered to competitors under the

Connecticut Access Services Tariff (CAST): namely, (1) interoffice transmission facilities, (2)

signaling networks, (3) call-related databases and (4)DS1 loops.[5]  Indeed, the DPUC found that

those four services "constitute identical services and perform identical functions to those services

currently contained in Sections 4 and 12 of [SNET's] Connecticut Access [Services] Tariff."

Therefore, the DPUC rejected the application of the TSLRIC  rate to those four services, and set

the rate applicable to them at parity with the rates already established by the previously approved

tariff: CAST.  In so doing, the DPUC acknowledged that the access tariff rates established in the

CAST "were not set by [the DPUC] using a TSLRIC methodology."

On January 3, 2000, in response to the DPUC's prior request, SNET submitted new cost

studies, which led to hearings in which WorldCom participated.  On June 29, 2000 the DPUC

issued its final decision on the pricing issue, which approved most of SNET's proposals, but, in

---

[5]"Interoffice transmission facilities" are transport facilities dedicated to a particular
customer or carrier, or shared by more than one customer or carrier, that provide
telecommunications service between switches owned by incumbent local exchange carriers or
requesting telecommunications carriers. See 47 C.F.R. § 51.319(d).

"Signaling networks" include, but are not limited to, signaling links and signaling transfer
points.  See 47 C.F.R. § 51.319(e).

"Call-related databases" are "defined as databases, other than operations support systems,
that are used in signaling networks for billing and collection, or the transmission, routing, or
other provision of a telecommunications service." 47 C.F.R. § 51.319(e)(2). They include, but are
not limited to, databases on Toll-Free calling, line information, 911 and number portability. Id. §
51.319(e)(2)(i).

A "DS1 Loop" is a digital signal service that provides two-way data information between
end users and the central office at a signaling data rate of 1.54Mb/s. See 47 C.F.R. § 51.319,
note, pg. 45.

WorldCom's view, did not address certain of its objections. WorldCom, as well as AT&T Communications of New England, Inc., filed a motion for reconsideration, claiming, inter alia, that the DPUC's June 29, 2000 decision failed to reevaluate the May 20, 1998 decision to price the rates for the four services at the levels set previously in the CAST. Both motions for reconsideration were denied. Subsequently, SNET filed a tariff containing rates consistent with the DPUC's order, which became effective July 1, 2000. These rates were incorporated into the interconnection agreement between SNET and WorldCom pursuant to the DPUC's April 23, 1997 order approving that agreement, and included the CAST rates for the four services.

On October 5, 2000, pursuant to 47 U.S.C. § 252(e)(6), WorldCom filed the instant action, alleging that its interconnection agreement with SNET violates the 1996 Act and its implementing regulations. More specifically, WorldCom alleges that:

> 1) The 1996 Act requires that tariffs for UNEs be established by a long-run, forward-looking cost methodology;
>
> 2) The rates set forth in the CAST, which were approved prior to the enactment of the 1996 Act, were not established by a long-run, forward-looking cost methodology;
>
> 3) The rates set forth in the CAST were based on a historical cost-based rate that is expressly prohibited by the 1996 Act; and
>
> 4) Therefore, the DPUC violated the 1996 Act by setting the rates for the four services at parity with the CAST rates.

In response, the defendants contend that: (1) the UNEs were set according to appropriate cost studies; (2) the 1996 Act allows a state commission to include a "reasonable profit" within the rates for the CAST services; and (3) the DPUC's decision to set the new UNE rates in parity with the CAST rates is neither arbitrary or capricious because it was necessary to prevent tariff

shopping by WorldCom and other competing carriers.

II      Analysis

        A. Standard of Review

        The parties first disagree about which standard of review this Court should apply in its review of the DPUC's decision. WorldCom claims that a district court's review of questions of law determined by the DPUC should be de novo. The defendants maintain that this case involves the review of factual determinations made by a state commission, which are reviewed under the arbitrary and capricious standard of review.[6]

        The 1996 Act provides that, "[i]n any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 of this title and this section." 47 U.S.C. § 252(e)(6). Therefore, the district court's sole responsibility is to determine whether the interconnection agreement meets the requirements of sections 251 and 252 of the Act. Indiana Bell Tel. Co., Inc. v. McCarty, 362 F.3d 378, 382 (7th Cir. 2004). Although the United State Court of Appeals for the

---

        [6] The defendants also contend that this Court should give great deference to the determinations made by the DPUC pursuant to Chevron U.S.A., Inc. v. Nat'l Resources Def. Council, Inc., 467 U.S. 837 (1984) (holding that courts should afford deference to federal agencies in their areas of expertise.). The argument has consistently been rejected by federal courts both in the context of the 1996 Act and in the context of other federal statutes and regulations. See, e.g., Turner v. Perales, 869 F.2d 140, 141 (2d Cir. 1989); Southern New England Telephone v. Connecticut, 2003 WL 22273538, at *5 (D. Conn. 2003) (citing cases). As one district court noted in a case involving the 1996 Act, "[t]he deference accorded federal agencies under Chevron is based upon the federal agency's expertise and familiarity with the subject matter of its mandate and the need for coherent and uniform construction of a federal law nationwide. . . . Those considerations are not applicable to a state agency's interpretation of federal law." MCI Telecomm.Corp. v. New York Telephone Co., 134 F.Supp.2d 490, 500-01 (N.D.N.Y. 2001) (internal citations and quotation marks omitted).

Second Circuit has not addressed the appropriate standard of review in an action brought under §

252(e)(6), other federal courts consistently have "held that where the state agency determination

rests principally on an interpretation of the [the 1996 Act], de novo review is applied. .  See, e.g.,

Global Naps, Inc. v. Verizon New England, Inc., 396 F.3d 16, 23 n.8 (1st Cir. 2005); see also

MCI Telecomms. Corp. v. Ohio Bell Tel. Co., 376 F.3d 539, 548 (6th Cir. 2004); Ind. Bell Tel.

Co. v. McCarty, 362 F.3d 378, 383 (7th Cir. 2004); MCIMetro Access Transmission Servs. v.

Bellsouth Telecomms., Inc., 352 F.3d 872, 876 (4th Cir. 2003); Coserv. Ltd. Liab. Corp. v.

Southwestern Bell Tel. Co., 350 F.3d 482, 486 (5th Cir. 2003);  MCI Telecomm. Corp. v. Bell

Atlantic-Pennsylvania, 271 F.3d 491, 517 (3d Cir. 2001); AT & T Communications of S. States,

Inc. v. BellSouth Telecomm., Inc., 268 F.3d 1294, 1296 (11th Cir. 2001); Southwestern Bell Tel.

Co. v. Brooks Fiber Communications of Okla., Inc., 235 F.3d 493, 498 (10th Cir. 2000); US

West Communications v. MFS Intelenet, Inc., 193 F.3d 1112, 1117 (9th Cir. 1999).[7]

"Once federal courts determine that state commissions properly interpreted the Act and its

regulations, courts apply an arbitrary and capricious standard to review the remaining state

_____

[7]See also MCI Telecomm. Corp. v. BellSouth Telecomm., Inc., 112 F.Supp.2d 1286,
1290-1292 (N.D.Fla. 2000); US West Communications, Inc. v. Hix ("Hix II "), 93 F.Supp.2d
1115, 1130 (D.Colo. 2000) (applying de novo review to state commission's interpretation of the
Act and its regulations); Michigan Bell Tel. Co. v. Climax Tel. Co., 121 F.Supp.2d 1104,
1108-09 (W.D.Mich. 2000); Bellsouth Telecomm., Inc. v. ITC Deltacom Communications, Inc.,
62 F.Supp.2d 1302, 1307 (M.D.Ala.1999) (adopting de novo standard of review for questions of
whether state commission "properly interpreted and applied the Act"); US West
Communications, Inc. v. Hix ("Hix I "), 986 F.Supp. 13, 19 (D.Colo. 1997) (holding that courts
should apply de novo review to questions of whether the state commissions' actions were
"procedurally and substantively in compliance with the Act and [its] implementing regulations").

commissions' determinations."[8] Southwestern Bell Tel. Co. v. Apple, 309 F.3d 713, 717 (10th

Cir. 2002); accord Ohio Bell Tel. Co., 376 F.3d at 548; US West Communications, 193 F.3d at

1117; MCI Telecomm. Corp. v. New York Telephone Co., 134 F.Supp.2d 490, 500-01

(N.D.N.Y. 2001); see also Southern New England Telephone v. Connecticut, 2003 WL

22273538, at *5 (D. Conn. 2003) (citing cases).  The arbitrary and capricious standard, however,

generally is reserved for highly technical issues.  Southwestern Bell Tel. Co. v. Apple, 309 F.3d

at 717; see also US West Communications, Inc., 193 F.3d at 1117 n.4 (noting the issues on

which the district court improperly applied the arbitrary and capricious standard of review).

    B. The 1996 Act and Rate Determinations[9]

    Pursuant to the 1996 Act:

> Any interconnection agreement adopted by negotiation or arbitration shall be
> submitted for approval to the State commission.  A State commission to which an
> agreement is submitted shall approve or reject the agreement, with written
> findings as to any deficiencies.

47 U.S.C. § 252(e)(1).  A state commission may reject an interconnection "agreement (or any

---

[8]The Second Circuit has explained, in the related context of review of federal agency decisions, that "[t]he scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency." Public Citizen, Inc. v. Mineta, 340 F.3d 39, 53 (2d Cir. 2003) (citing Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 42-43 (1983)).  "This highly deferential standard is particularly appropriate when reviewing findings of fact made by an agency in enforcing the 1996 Act." MCI Telecomms., 134 F.Supp.2d. at 500-01.  In reviewing the agency's decision, the court considers "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Id.  The court looks for a "rational connection between the facts found and the choice made." State Farm, 463 U.S. at 43. (citing Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)).  A reviewing court may uphold an agency decision of "less than ideal clarity if the agency's path may reasonably be discerned," but it may not supply a "reasoned basis for the agency's action that the agency itself has not given." Public Citizen, 340 F.3d at 53.

[9]There is no dispute that the interconnection agreement between SNET and WorldCom was approved by the DPUC after the enactment of the 1996 Act.

portion thereof) adopted by arbitration . . . if it finds that the agreement does not meet the requirements of section 251 of this title, including the regulations prescribed by the Commission pursuant to section 251 of this title, or the standards set forth in subsection (d) of this section." Id. § 252(e)(2).  Pursuant to § 251, a state commission must determine whether the incumbent LEC has provided unbundled access to network elements "on rates, terms and conditions that are just, reasonable and nondiscriminatory in accordance with the terms and conditions of the agreement and the requirements of this section and section 252 of this title." 47 U.S.C. § 251 (c)(3). Pursuant to § 252:

> Determinations by a State commission of the just and reasonable rate for the interconnection of facilities and equipment for purposes of subsection (c)(2) of section 251 of this title, and the just and reasonable rate for network elements for purposes of subsection (c)(3) of such section–
>
> (A) shall be--
> > (i) based on the cost (determined without reference to a rate-of-return or other rate-based proceeding) of providing the interconnection or network element (whichever is applicable), and
> > (ii) nondiscriminatory, and
>
> (B) may include a reasonable profit.

47 U.S.C. § 252(d)(1).[10]  Further, the implementing regulations for the 1996 Act require that, when determining the LEC's "cost" pursuant to § 252(d)(1)(A)(I), a state commission must employ a "forward-looking cost methodology." See 47 C.F.R. § 51.505 (setting forth the total element long run incremental cost methodology (TELRIC) as the appropriate forward-looking methodology); see also Verizon Communications Inc. v. FCC, 535 U.S. 467 (2002) (holding that TELRIC methodology conforms to the requirements of 1996 Act).[11]  As noted previously in this

---

[10]Although § 252(d) allows for a "reasonable profit" to be included in the rates, the implementing regulation for the pricing of elements, 47 C.F.R. § 51.05, does not mention profit.

[11]TELRIC requires local regulators to determine the cost of supplying a particular incumbent network element to a new entrant not by looking at what it has cost that incumbent to supply the element in the past, nor by looking at what it will cost that incumbent to supply that element in the future. Rather, the regulator must look to what it would cost a hypothetical

ruling, the FCC's establishment of TELRIC marked a significant departure from prior pricing

methodologies, which traditionally were based on the historic or "embedded" costs of an LEC.

See Verizon, 535 U.S. 477-88 (providing background on pre-TELRIC ratemaking by public

utilities in the United States).  In addition to establishing a new pricing methodology focused

solely on the cost of providing a service on a forward-looking basis, Congress explicitly

prohibited a state commission or LEC from including historic costs or price subsidies for other

services in rates for UNEs.  See 47 U.S.C. § 252(d)(1)(A)(i) (cost "determined without reference

to a rate-of-return or other rate-based proceeding"); 47 C.F.R. § 51.505(d) (setting forth "[f]actors

that may not be considered in a calculation of the forward-looking economic cost of an

element").[12]

        C. The DPUC's Decision

       In its decision dated June 29, 2000, the DPUC agreed with WorldCom that "the existing

access tariff charges [for the four disputed services] were not set by [the DPUC] using a TSLRIC

methodology" and, therefore, they "are, without question, above their respective cost."  Despite

having determined that "the unbundled rates for UNEs should be based on TSLRIC plus 35%

contribution," and applying that methodology to other services, the DPUC "[did] not consider

that standard applicable to those [four disputed] services delineated above which have

_____

efficient firm to supply that element in the future, assuming that the hypothetical firm were to
build essentially from scratch a new, efficient communications network. See 47 C.F.R. § 51.505.

       [12]Although WorldCom challenges the DPUC's decision solely on the basis of its lack of
conformity with federal law, the Court notes that the Connecticut statutes mirror the provision of
the 1996 Act. See, e.g., Conn. Gen. Stat. § 16-247b(b) ("the rates for interconnection and
unbundled network elements and any combination thereof shall be based on their respective
forward looking long-run incremental costs, and shall be consistent with the provisions of 47
U.S.C. § 252(d)") and § 16-247b(b) (providing that an LEC shall not use the revenues "derived
from or associated with providing a noncompetitive service to subsidize its provisions of
competitive, emerging competitive or unregulated telecommunications service.").

correspondent offerings in Sections 4 and 12 of the [CAST]."  In reaching this conclusion, the DPUC noted that it was "not of the opinion that pricing these elements on the basis of TSLRIC in any way encourages facilities-based competition and may prove damaging to the market balance that currently exists between local and long distance services."  Therefore, the DPUC required SNET "to adjust its correspondent rates introduced in this proceeding to a level that maintains price parity with their respective [CAST] Sections 4 and 12 counterparts . . . ."[13]  Accordingly, the Court finds that the rates incorporated into the parties' interconnection agreement for the four disputed services are not derived from an appropriate forward-looking methodology, and, therefore, they are in violation of the 1996 Act.[14]

The DPUC's decision as to the methodology for setting the rates for the four disputed services can be traced to the decision in Iowa Utilities Board v. FCC, 120 F.3d 753, 795 (8th Cir., July 18, 1997), in which the Eighth Circuit "conclude[d] that the Act plainly grants the state commissions, not the FCC, the authority to determine the rates involved in the implementation of the local competition provisions of the Act." More specifically, the Eighth Circuit concluded that the FCC exceeded its jurisdiction by promulgating 47 C.F.R. §§ 51.503, 51.505 (1996), which require a state commission to employ the TELRIC methodology when pricing UNEs.  It is clear that the Eighth Circuit's opinion strongly influenced the DPUC's decision not to price the rates for the four disputed services in accordance with the TELRIC methodology, as the DPUC's

---

[13]The DPUC not only ordered that the UNE rates be priced in parity with the correspondent CAST rates, but it ordered that any changes made to the CAST rates be "reflected immediately" in the UNE rates.

[14]Both TSLRIC (the DPUC's pricing methodology for rate of the services not involved in this action) and TELRIC (the FCC-approved pricing methodology) are "forward-looking" and similar.  See footnote 15, infra.

decision states:

> The Eighth Circuit decision had a profound effect on the measure of discretion available to this Department in addressing the issue of UNEs. For purposes of this proceeding it is important to understand that the [Eighth Circuit] concluded that a standardized pricing methodology was an abridgement of the state's authority to set prices for service. The [Eighth Circuit] further determined that responsibility for recombining UNEs into marketable services was the singular responsibility of the requesting [competing local exchange carriers] thereby freeing the incumbent local exchange carrier (ILEC) of certain duties and obligations sought by the FCC.

After the issuance of the DPUC's decision, however, the United States Supreme Court reversed the Eighth Circuit's decision in <u>Iowa Utilities Board</u>, and held, inter alia, that "the [FCC] has jurisdiction to design a pricing methodology." <u>AT&T Corp. v. Iowa Utilities Board</u>, 525 U.S. 366, 384 (1999) (reversing the Eight Circuit and remanding for further consideration by that court). Therefore, the Court finds that the DPUC decision, in addition to being contrary to the language of federal statutes and regulations, also is based on a court decision that is no longer good law.

The subsequent procedural history in <u>Iowa Utilities Board</u> provides further support to this Court's conclusion that the DPUC's decision is contrary to federal law and regulations. On remand from the Supreme Court, the Eighth Circuit held that, although the FCC was allowed to design a pricing methodology pursuant to the Supreme Court's holding, § 252(d)(1) foreclosed the use of the TELRIC methodology. <u>Iowa Utilities Bd. v. F.C.C.</u>, 219 F.3d 744, 751-53 (8th Cir. 2000). The Supreme Court granted certiorari once again. <u>Verizon Communications, Inc. v. F.C.C.</u>, 531 U.S. 1124 (2001). The issue before the Supreme Court the second time was, inter alia, the "legality and logic of the particular methodology the Commission chose." <u>Verizon Communications, Inc. v. F.C.C.</u>, 535 U.S. 467, 493 (2002). The Supreme Court once again

13

reversed the Eighth Circuit, holding: (1) that the FCC can require state commissions to set rates

for network elements based on TELRIC methodology with reference to a hypothetical, most

efficient network; and (2) that the FCC can require ILECs to combine unbundled network

elements at the request of competing local exchange carriers ("CLEC") who cannot combine such

elements themselves.  Id. at 501-23.  In so holding, the Supreme Court noted that:

> Whether the FCC picked the best way to set these rates is the stuff of debate for
> economists and regulators versed in the technology of telecommunications and
> microeconomic pricing theory. The job of judges is to ask whether the
> Commission made choices reasonably within the pale of statutory possibility in
> deciding what and how items must be leased and the way to set rates for leasing
> them. The FCC's pricing and additional combination rules survive that scrutiny.

Id, 539.  In the wake of that decision, therefore, state commissions, such as the DPUC, must

abide by the requirement that TELRIC be utilized when setting rates for UNEs. Because the rates

set by the DPUC in the CAST were not calculated under such a method, and the four UNEs

involved in the present case were priced at parity with the rates set forth in the CAST, they

violate federal law.  Consequently, WorldCom is entitled to the requested declaratory and

equitable relief.

    D. Defendants' arguments

       Despite the fact that the rates at issue in the present action were not set in accordance with

federal law and regulations, the defendants set forth additional reasons why WorldCom is not

entitled to the requested relief.  The Court will address the reasons proffered by SNET first, and

then address the reasons proffered by the DPUC.

    1. SNET

SNET's main argument in its proposed ruling is summarized as follows: SNET submitted

costs studies to the DPUC; the cost studies were based on TSLRIC;[15] the DPUC set the rates

based on SNET's cost studies; and, therefore, the central issue really is WorldCom's complaint

about the amount of "reasonable profit" the DPUC added to SNET's baseline TSLRIC costs.

This arguments is belied, however, by the DPUC's decision dated May 20, 1998, which stated

that "the existing access tariff charges were not set by [the DPUC] using a TSLRIC

methodology," and that, therefore, they "are, without question, above their respective cost."

Moreover, as noted previously in this ruling, the DPUC, despite having determined that "the

unbundled rates for UNEs should be based on TSLRIC plus 35% contribution," specifically

noted that it did "not consider that standard applicable to those services delineated above which

have correspondent offerings in Sections 4 and 12 of the [CAST]."  Indeed, the DPUC further

noted that it was "not of the opinion that pricing these elements on the basis of TSLRIC in any

way encourages facilities-based competition and may prove damaging to the market balance that

currently exists between local and long distance services."  Therefore, the Court finds that

SNET's argument fails to comport with the appropriate test of the DPUC's decision.

### 2. The DPUC

The DPUC makes several additional arguments as to why WorldCom is not entitled to the

relief sought.  The DPUC's first argument is that, given WorldCom's acknowledgment that a

LEC is entitled to a "reasonable profit" under the 1996 Act, WorldCom's challenge is not to the

---

[15]There is some dispute as to whether the TSLRIC methodology employed by SNET, and accepted by the DPUC, is the same as the TELRIC methodology required by the 1996 Act and implementing regulations. See Plaintiff's proposed ruling, ¶ 5; DPUC's proposed ruling, p. 19, n.7. Because the Court finds that the rates for the four disputed services were set at parity with the rates already established by the CAST, and not according to *any* forward-looking methodology, the question of whether the TSLRIC methodology is the functional equivalent of the TELRIC methodology need not be addressed.

methodology used to set the rates, but rather to the DPUC's factual determination of what profit SNET was entitled to for the UNEs. The Court disagrees with this characterization of WorldCom's challenge, as the complaint clearly frames the issue involved in this case as whether the rates comply with the methodology mandated by the FCC and the Act. Even if the DPUC's characterization were accurate, however, the Court would reject DPUC's argument for several reasons.

First, as noted previously in this ruling, the DPUC's decision demonstrates that the rates were not set using TSLRIC, but rather were based on the rates already established in the CAST. Without first determining what the base cost would be to SNET on a forward-looking basis, as required by TSLRIC, the DPUC can not have made a factual determination as to what "reasonable profit" SNET would be entitled to above and beyond that base cost.

Second, even if the DPUC did use TSLRIC to establish the base costs for the four UNEs, the record shows that the DPUC never made any specific findings about what a "reasonable profit" would be for SNET. To the contrary, the record shows that the DPUC's primary concern was setting the rates at parity with the rates already established in the CAST, thus preventing what is termed "tariff shopping" or "arbitrage." The DPUC's concern about arbitrage was based on SNET's argument that "any requirement by the [DPUC] to limit pricing UNEs to or near the respective incremental cost of the [UNE, in accordance with TSLRIC,] would be detrimental to [SNET's] financial health." Simply put, the record shows that the DPUC was not concerned with the level of reasonable profits that should be added to the TSLRIC baseline cost, but rather with protecting the profits SNET already was receiving under the CAST, which was no longer in compliance with federal or state law. In addition, the record does not contain any evidence that

16

the DPUC examined the profits available to SNET under the CAST to determine if they

complied with the 1996 Act's requirement that they be "reasonable."

 The DPUC's next claim is that because elements in the CAST were unbundled before the

enactment of the 1996 Act, and nothing in the 1996 Act or implementing regulations requires

state commissions to revisit prior unbundling decisions, the DPUC had the authority to price the

services at issue in the instant action at parity with similar services already offered on an

unbundled basis in the CAST.  In support of this position, the DPUC cites 47 U.S.C. § 252(e)(3),

which provides:

> Notwithstanding paragraph (2), but subject to section 253 of this title, nothing in
> this section shall prohibit a State commission from establishing or enforcing *other*
> *requirements* of State law in its review of an agreement, including requiring
> compliance with intrastate telecommunications *service quality standards or*
> *requirements*. (Emphasis added)

The Court finds that the term "other requirements," as it is used in § 252(e)(3), is intended to

allow states to enforce requirements that are outside of the scope of the 1996 Act, such as

"service quality standards or requirements."  Put another way, this allows states to continue to

enforce requirements of state law that provide additional protections to those set forth in the 1996

Act.  Pricing methodology is explicitly within the scope of the 1996 Act, and the pricing

methodology used to set rates for the CAST fails to comply with the pricing methodology set

forth in the subsequently passed 1996 Act.  Therefore, the Court finds that § 252(e)(3) does not

permit the DPUC to continue to apply rates set under the CAST for the four disputed UNEs.

 This conclusion is buttressed by the fact that § 252(e)(3) notes that a state commission's

ability to enforce "other restrictions" is limited by the provisions of § 253, which provides that

"[n]o State or local statute or regulation, or other State or local legal requirement, may prohibit or

17

have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." The Second Circuit, agreeing with prior courts that have addressed this issue, has stated that "a prohibition does not need to be complete or 'insurmountable' to run afoul of § 253(a)." TCG New York, Inc. v. City of White Plains, 305 F.3d 67, 76 (2d Cir. 2002) (concluding that a local ordinance violated § 253(a)). The Second Circuit has further indicated that, when determining whether a state or local statute or regulation has the effect of prohibiting the provision of telecommunications services under § 253(a), a reviewing court should "consider whether the ordinance materially inhibits or limits the ability of any competitor or potential competitor to compete in a fair and balanced legal and regulatory environment." Id. (quoting Cal. Payphone Ass'n, 12 F.C.C.R. 14191, 1997 WL 400726, at ¶ 31 (1997)). Allowing the DPUC to keep rates set at levels established under a traditional pricing methodology (which allows for a LCE to recoup more of its historical costs and investments) and not set them under the TSLRIC methodology (which requires rates based solely on forward-looking costs) can not be said to accord with the mandate of the 1996 Act generally, or § 253 more specifically. See Iowa Utilities Board, 525 U.S. 724 (the 1996 Act "fundamentally restructures local telephone markets, ending the monopolies that States historically granted to local exchange carriers (LECs) and subjecting incumbent LECs to a host of duties intended to facilitate market entry, including the obligation under 47 U.S.C. § 251(c) to share their networks with competitors").

In addition, § 251(d)(3) provides that, "[i]n prescribing and enforcing regulations to implement the requirements of this section, the [FCC] shall not preclude the enforcement of any regulations, order, or policy of a State commission that-

(A) establishes access and interconnection obligations of local exchange carriers;

18

(B) is consistent with the requirements of this section; and

(C) does not substantially prevent implementation of the requirements of this section and the purposes of this part."

Given the explicit direction of Congress in the 1996 Act that all rates for UNEs should be based on a TELRIC methodology, and the explicit prohibition by Congress against the inclusion of historical costs or price subsidies in the UNE rates, the Court finds that the rates established under the CAST would violate both subpart (B) and (C) of § 251(D)(3). Moreover, the Court finds that the policy rationale behind the DPUC's decision to set the rates at parity with the CAST rates, namely, to protect SNETs already established profits and to prevent tariff shopping, is in conflict with the purpose of the 1996 Act: to set prices at a level that encourages more market participants. See Alenco Communications Inc. v. FCC, 201 F.3d 608, 620 (5th Cir. 2000) ("The [1996] Act does not guarantee all local telephone service providers a sufficient return on investment; quite to the contrary, it is intended to introduce competition into the market. Competition necessarily brings the risk that some telephone service providers will be unable to compete."). Therefore, the Court finds that the fact that the four disputed services were unbundled under the CAST fails to militate against the fact that those services are priced at levels that are in violation of the 1996 Act.

The DPUC's third argument is that its determination to set the UNE rates at parity with the CAST rates was a policy decision, and, as such, it should be reviewed under the arbitrary and capricious standard of review. As this ruling noted previously, however, a state commission's interpretation of the 1996 Act receives de novo review, and the arbitrary and capricious standard of review is reserved for factual determinations, which generally are highly technical in nature.

Apple, 309 F.3d at 717.  The decision subject to review in the instant action is the DPUC

decision, made in accordance with the Eighth Circuit's Iowa Utilities Board decision, that it did

not have to set the rates for the four disputed services in accordance with the TELRIC

methodology.  This type of decision does not qualify for the arbitrary and capricious standard of

review.

The DPUC's final argument is that WorldCom's concern over the parity pricing scheme

for the four disputed elements was not encompassed in the DPUC's June 29, 2000 decision, and,

therefore, WorldCom's claim in the instant case that those UNE rates were set by the DPUC is

unsupported by the record.  Essentially, the DPUC is claiming that, because the June 29, 2000

decision underlies the instant action, and the decision to set SNET's rates at parity with the

CAST rates was made in the May 20, 1998 decision, WorldCom cannot challenge that decision

in the instant action.

Prior to the June 29, 2000 decision, WorldCom filed a brief with the DPUC requesting

that DPUC rescind the parity pricing scheme because the CAST methodology upon which the

rates were set is in violation of federal law and wholly contrary to FCC pricing rules.  After the

June 29, 2000 decision failed to address that concern, WorldCom filed a motion for

reconsideration on that ground.  This motion was denied.  Although the DPUC did not address its

prior decision to set the rates at parity with the CAST rates in its June 29, 2000, decision, this

was not due to the failure of WorldCom to raise that issue.  Therefore, the DPUC's pricing

decision is properly before the Court in the instant action

V.        Conclusion

As the Supreme Court has stated: "[The 1996] Act appears to be an explicit disavowal of

20

the familiar public-utility model of rate regulation (whether in its fair-value or cost-of-service

incarnations) . . . in favor of novel ratesetting designed to give aspiring competitors every

possible incentive to enter local retail telephone markets, short of confiscating the incumbents

property." <u>Verizon Communications, Inc</u>, 535 U.S. at 489.  Although the DPUC may be correct

that setting rates in accordance with the 1996 Act could possibly lead to arbitrage and tariff

shopping, and lower profits for existing companies such as SNET in certain situations, the

DPUC's failure to set SNET's rates in accordance with the 1996 Act requires this Court to grant

WorldCom the declaratory and equitable relief sought in the complaint.  Therefore, the Court

declares that:

1) The provisions of the WorldCom/SNET Agreement fail to set forward-looking, cost-

based UNE rates in accordance with the mandated long-run, forward-looking cost methodology

for interoffice transmission facilities, signaling networks, call-related databases and DS1 loops,

and thereby violate the 1996 Act and the FCC's implementing orders and regulations; and

2) The Agreement must be reformed by in a manner consistent with the 1996 Act and the

FCC's implementing orders and regulations.

SO ORDERED this   28th   day of June 2005, at Hartford, Connecticut.


**/s/ CFD**
**Christopher F. Droney**
**United States District Judge**